UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LISA RUZIKA and KAREN LACOMBE        :
          Plaintiffs,                :
                                     :
     v.                              :  NO. 3:03CV1416(EBB)
                                     :
COMMUNITY SYSTEMS, INC., et al,      :
          Defendants.                :

RULING ON DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

Defendants have moved this Court to enforce an oral settlement agreement purportedly reached between Plaintiffs' former counsel, Erin O'Neil ("O'Neil"), and counsel for Defendants.  For the reasons set out below, Defendants' Motion for Enforcement of Settlement Agreement [Doc. No. 58] is DENIED.

Background

Defendants have moved this Court for an order to enforce the purported oral settlement agreement entered into between Defendants and Plaintiffs through their attorneys.  Defendants allege that settlement negotiations between Jennifer Tindall ("Tindall"), co-counsel for Defendants, and O'Neil began in early October, 2004, and that Attorney O'Neill proposed settling the case for $30,000.00.  Defendants' Mem. of Law in Support of Mot. for Enforcement ("Defendants' Mem.") at 3, Exh. 1 (Tindall Affidavit).  On October 18, 2004, Tindall contacted O'Neil and informed her that Defendants accepted Plaintiffs' offer to settle

the case. Defendants' Mem. at 3. Defendants allege that, during that conversation, Tindall confirmed the settlement amount and discussed specific terms relating to the settlement. Defendants allege that the parties agreed upon the following: 1) the amount of the settlement; 2) that the settlement amount would be divided equally between the two Plaintiffs; 3) that the settlement amount included attorney's fees; 4) that Plaintiffs each would be required to execute a settlement agreement and general release prepared by Defendants' counsel; and 5) that the settlement agreement would include sections related to non-disparagement, confidentiality, liquidated damages in the event of a breach of confidentiality, re-employment and tax indemnification. Defendants' Reply to Plaintiffs' Objection to Mot. for Enforcement of Settlement Agreement ("Defendants' Reply") at 2. Defendants assert that the only item upon which agreement had not been reached was the allocation of the settlement amount as to wages, emotional damages and attorney's fees. Id. On October 27, 2004, counsel for Defendants sent O'Neil a letter confirming the October 18, 2004 conversation regarding settlement. In that letter, Tindall noted that the attorneys discussed that the Plaintiffs would sign a settlement agreement and general release. Tindall stated that, in addition, the agreement would contain a confidentiality paragraph, would provide for liquidated damages

2

in the event either Plaintiff breached the confidentiality provision, and would contain a non-disparagement provision. Tindall also stated, "This settlement of this matter is contingent upon both Plaintiffs executing their respective settlement agreements. If one Plaintiff refuses to execute her settlement agreement, Defendants reserve the right to revoke this offer to settle with the other Plaintiff. The terms of this letter and settlement discussions to date are confidential and Plaintiffs agree that they will not discuss these terms regardless of whether they ultimately execute the Settlement Agreements." Tindall Affidavit, attachment A.

On November 8, 2004, Defendants' co-counsel, Tasos Paindiris ("Paindiris"), sent O'Neil the proposed settlement agreements. Defendants' Mem. Exh. 2 (Paindiris Affidavit) ¶4. The cover letter stated as follows: "Enclosed are the proposed settlement agreements for your review. Please contact me to confirm that the terms are acceptable. I will then send you two originals for each Plaintiff to sign and return to me." Paindiris Affidavit, attachment A. On November 29, 2004, Paindiris wrote to O'Neil again, noting that three weeks had passed and he had not heard back from her regarding the agreements. Paindiris Affidavit ¶5. On December 3, 2004, Paindiris received a voice mail message from O'Neil stating that she was "having trouble with her clients" and

3

was trying to work with them on the terms of the settlement agreement. Paindiris Affidavit ¶6. Finally, on December 10, 2004, Paindiris received a voice mail message from O'Neil stating that Plaintiffs "were not willing to settle" for the $30,000.00 amount, and that "they've had a change of heart." Paindiris Affidavit ¶7. On December 13, 2004, Paindiris wrote to O'Neil stating that if the agreements were not signed by December 17, Defendants would file the instant motion. Paindiris was unable to reach O'Neil that week and did not receive a response to his calls. Paindiris Affidavit ¶8. The instant motion was filed on December 23, 2004.

Plaintiffs Ruzika and LaCombe maintain that they were "kept in the dark" by O'Neil regarding the progress of their case during September and October of 2004, attempting to reach their attorney six different times to ascertain the status of their case. Each time one of the Plaintiffs called O'Neil's office, she requested that O'Neil return the call. Plaintiffs' Opposition to Defendants' Motion for Enforcement of Settlement Agreement ("Plaintiffs' Opp.") at 2. Finally, at the end of October, Plaintiff Ruzika reached O'Neil by telephone, and O'Neil informed her that Defendants had offered to settle the case for $30,000.00. Plaintiffs' Opp. at 3, Exh. A (Ruzika Affidavit) ¶5. In her sworn affidavit, Ruzika states that she "immediately told

Attorney O'Neil that [she] would not accept the offer." Id. Ruzika asserts that O'Neil requested that she come to her office during the first week of November, 2004. At the end of October, 2004, O'Neil telephoned Plaintiff LaCombe to inform her that the Defendants had made a settlement offer. Plaintiffs' Opp. at 3, Exh. B (LaCombe Affidavit) ¶4. In her sworn affidavit, LaCombe states that she told O'Neil that she did not think it was a fair amount and would have to get back to O'Neil after speaking with her husband. Id. LaCombe then spoke with O'Neil later that same day and told her the settlement offer was unacceptable and that she would not take it. LaCombe Affidavit ¶5.

Both Plaintiffs met with O'Neil on November 5, 2004. At that meeting they again told O'Neil that the settlement was unacceptable. O'Neil urged them to reconsider. Plaintiffs' Opp. at 4, Ruzika Affidavit ¶7, LaCombe Affidavit ¶8. O'Neil stated that Plaintiffs would have to pay her $4,400.00 by the end of November, 2004, if they wished to proceed with the case, otherwise she would be forced to settle the case.[1] Plaintiffs' Opp. at 4, Ruzika Affidavit ¶7, LaCombe Affidavit ¶8. LaCombe mailed a check in the amount of $2,200.00 to the offices of Brewer & O'Neil on December 5, 2004. The check cleared LaCombe's

---

[1] It concerns the Court that O'Neil allegedly threatened to settle the case against Plaintiffs' wishes if they did not pay $4,400.00 by the date O'Neil specified.

5

account on December 8, 2004. LaCombe Affidavit ¶10. Ruzika needed more time, and left a voice mail message for O'Neil at the end of November asking for a few more weeks within which to make her payment. Ruzika Affidavit ¶8. Jack Chassen, a Brewer & O'Neil employee, left Ruzika a voice mail message in early December stating that O'Neil needed her payment by the end of the week or she would have to settle the case. Ruzika Affidavit ¶9. Ruzika attempted to call O'Neil on at least ten occasions between the first week in December and the first week in January of 2005 to relay credit card information for her payment; O'Neil did not return her telephone calls. Ruzika Affidavit ¶11. Ruzika called chambers on January 6, 2005, and was advised by staff that she should try to reach O'Neil again. See Letter from Lisa Ruzika Moffo to Hon. Ellen Burns of 1/07/05 [Doc. No. 71]. Both Plaintiffs drove to the Brewer & O'Neil firm on January 7, 2005, and were told that the firm was dissolving, that O'Neil could not take her cases with her, and that they would be receiving a letter to that effect. Ruzika Affidavit ¶13-17, LaCombe affidavit ¶16-18. Both Plaintiffs wrote to this Court in early January of 2005 expressing their concerns over their representation by O'Neil. See Letter from Lisa Ruzika Moffo to Hon. Ellen Burns of 1/07/05 [Doc. No. 71]; Letter from Karen LaCombe Martin to Hon. Ellen Burns of 1/08/05 [Doc. No. 70].

Plaintiffs retained new counsel in April of 2005 and have opposed the instant motion.

Existence of a Valid Settlement Agreement

Defendants argue that O'Neil entered into a binding settlement agreement which this Court should enforce. Furthermore, in their Reply to Plaintiffs' Opposition, Defendants assert that 1) Plaintiffs authorized O'Neil to agree to the settlement terms and 2) the parties intended to be bound by the oral agreement. Defendants' Reply at 3-8.  The issue before the Court is whether the purported October 18, 2004, oral agreement between O'Neil and Defendants' counsel, which arose from telephone settlement discussions beginning in early October of 2004, is binding.

   A.  O'Neil's Authority to Settle

The lawyer-client relationship is one of agent and principal.  United States v. Int'l Bhd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993).  In a case arising under federal law, an attorney's authority to bind his client is determined according to federal precedent.  Fennell v. TLB Kent Co., 865 F.2d 498, 501 (2d Cir. 1989).  The decision to settle a case is the client's alone, absent exigent circumstances, and the client does not automatically bestow authority to settle by virtue of the retainer.  See United States v. Beebe, 180 U.S. 343 (1901), *cited*

7

*in* Fennell, 865 F.2d at 501. ("Indeed, the utter want of power of an attorney, by virtue of his general retainer only, to compromise his client's claim, cannot, we think, be successfully disputed."). 180 U.S. at 352.

An attorney's actual authority "may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." In re Artha Mgmt., Inc., 91 F.3d 326, 329 (2d Cir. 1996) (quoting Int'l Bhd., 986 F.2d at 20 (citations omitted)). Apparent authority is "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." RESTATEMENT (SECOND) OF AGENCY § 8 (1958). "It is the law in this circuit, as well as generally, that customarily only the representation of the principal to the third party can create apparent authority, not the representation of the agent alone." Int'l Bhd., 986 F.2d at 20.

In the Second Circuit, "because of the unique nature of the attorney-client relationship, and consistent with the public policy favoring settlements," when the attorney-of-record enters into a settlement agreement on behalf of a client, it is presumed that the attorney had authority to do so. In re Artha, 91 F.3d at 329. Therefore, "any party challenging an attorney's

8

authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." Id.

Here, Plaintiffs bear that burden.  Plaintiffs aver that they had no knowledge O'Neil was engaging in settlement negotiations until after O'Neil has accepted an offer to settle the case for $30,000.00 on their behalf.  Plaintiffs surely could not have manifested to O'Neil, through either words or conduct, that she was authorized to accept the settlement terms when they had no idea she was engaging in settlement discussions.  In re Artha, 91 F.3d at 329.  And, at the end of October, when O'Neil told each Plaintiff that Defendants had made an offer to settle the matter for $30,000.00, each Plaintiff rejected the offer that same day.  "It is a client's duty to express disapproval of a settlement within a reasonable time, if he has a basis for disapproval."  Beirne v. Fitch Sanitarium, Inc., 167 F. Supp. 652, 654 (S.D.N.Y. 1958), *quoted in* Int'l Bhd., 986 F.2d at 21.  Thus, O'Neil had no actual authority to settle the matter.  Furthermore, O'Neil could not wrest actual authority from Plaintiffs merely because they were unable to pay $4,400.00 by the end of November as she requested.

Defendants argue that even if O'Neil had no actual authority, she had apparent authority, and the settlement should

be upheld because they had no reason to doubt that authority. See Fennell, 865 F.3d at 502 ("if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld") (citation omitted).  Defendants assert that Plaintiffs made no moves to indicate to them or the Court that O'Neil was not authorized to represent them in settlement discussions, and that O'Neil's voicemail stating that Plaintiffs had had a "change of heart" indicated that O'Neil had authority to settle at one point.[2]  See Defendants' Reply at 5-6.  However, "[t]he crucial question in ascertaining whether apparent authority has been created is whether the principal has made representations concerning the agent's authority to the third party." Edwards v. Born, 792 F.2d 387, 390 (3rd Cir. 1986).  Plaintiffs apparently attended several depositions with counsel, but this fact, without more, does not establish that Plaintiffs clothed O'Neil with apparent authority to settle the case without their knowledge of either the terms of the settlement agreement or the fact that the attorneys were engaged in settlement discussions.[3]

---

[2] Plaintiffs dispute O'Neil's characterization that they had a "change of heart," and claim that they had no idea settlement negotiations had taken place and that they immediately rejected the settlement offer upon hearing it from O'Neil.

[3] Plaintiffs' Opposition notes that O'Neil never wrote to defense counsel to confirm the acceptance of the $30,000.00 settlement offer.  See Plaintiffs' Opposition to the Defendants' Motion for Enforcement of Settlement Agreement [Doc. No. 67].

In Fennell v. TLB Kent Co., the Plaintiff's attorney agreed to settlement during a telephone conference in which no party participated. 865 F.2d 498. Plaintiff claimed that he rejected the offer that same day, after being advised as to its terms by his attorney. Id. at 500. However, the Defendants argued that the settlement should be upheld since Plaintiff's attorney was clothed in apparent authority and the Plaintiff had made no manifestations otherwise. The District Court agreed. In reversing the District Court, the Second Circuit held that, even though the District Court found that Fennell knew settlement was being discussed and neither asked his attorneys not to discuss settlement nor told counsel for Defendants that his counsel had limited authority, Fennell himself never engaged in "positive actions or manifestations" that reasonably would have led defense counsel to believe Fennell's attorney had the apparent authority to settle. Id. at 502. See also Musso v. Seiders, 98 F. Supp. 2d 197 (D. Conn. 1999) (holding that defense attorney lacked apparent authority to settle where the record did not indicate that Defendants themselves took positive action that would show their attorney had such authority).

Similarly here, O'Neil allegedly agreed to settlement with defense counsel during a telephone conference on October 18, 2004. Meanwhile, Plaintiffs had been attempting to reach O'Neil

11

during the months of September and October to no avail, and O'Neil did not return their calls. It was only at the end of October that Plaintiffs learned O'Neil had engaged in settlement discussions, when O'Neil told Plaintiffs Defendants had offered to settle for $30,000.00. Both Plaintiffs rejected the offer the same day they learned of it. Furthermore, in early January of 2005, after attempting once more to contact O'Neil by visiting the law offices of Brewer & O'Neil, both Plaintiffs wrote to this Court expressing their concerns regarding the representation provided by the firm. See Letter from Lisa Ruzika Moffo to Hon. Ellen Burns of 1/07/05 [Doc. No. 71] ("I know that there is a Summary Judgment coming up and [I] am afraid that without any representation I will have the case dismissed. I did not know where else to turn nor do I know where Summary Judgment is held, if I have to be there or who even handles it."). Plaintiffs did not take any positive action that would have reasonably led defense counsel to believe O'Neil had the apparent authority to settle the case. Thus, O'Neil had neither actual authority nor apparent authority to settle the matter on behalf of Plaintiffs.

 B. Enforceability of the Alleged Oral Agreement

 Defendants' second argument is that the oral agreement reached with O'Neil via telephone on October 18, 2004, and memorialized in the letter sent to O'Neil on October 27, 2004,

was binding upon Plaintiffs because neither party reserved their right not to be bound absent a signed writing, agreement had been reached on all relevant terms, and Defendants engaged in partial performance by not moving this Court for Summary Judgment. <u>See</u> Defendants' Mem. at 7-9.

There is a strong public policy encouraging settlement. <u>See generally</u> <u>U.S. v. Glens Falls Newspapers</u>, 160 F.3d 853, 855-57 (2d Cir. 1998) ("[F]ostering settlement is an important Article III function of the federal district courts. Every case must be dropped, settled or tried, and a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); <u>Anita Found., Inc. v. ILGWU Nat'l Ret. Fund</u>, 902 F.2d 185, 190 (2d Cir. 1990) ("Courts are wary of disturbing settlements, because they represent compromise and conservation of judicial resources, two concepts highly regarded in American jurisprudence."). However, "[e]nforcing premature oral settlements against the expressed intent of one of the parties will not further a policy of encouraging settlements. People may hesitate to enter into negotiations if they cannot control whether and when tentative

proposals become binding." Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997).

"It is . . . well established that parties are bound to the terms of a contract even though it is not signed and is an oral agreement." Millgard Corp., v. White Oak Corp., 224 F. Supp. 2d 425, 432 (D. Conn. 2002) (citation omitted). A settlement agreement will be deemed valid if the parties have voluntarily entered into the agreement and have mutually assented to the terms and conditions of that agreement. Id. The intent to memorialize the agreement in writing does not prevent the agreement from binding the parties at the time of the oral agreement. Consarc Corp., v. Marine Midland Bank, N.A., 996 F.2d 568, 574 (2d Cir. 1993). Accord R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir. 1984) ("[W]here there is no understanding that an agreement should not be binding until reduced to writing and formally executed, and [w]here all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, then an informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document") (internal quotation marks and citations omitted) (second alteration in original). Furthermore, once the parties have reached settlement, they will be bound to its terms, even if they have a change of heart before

14

the oral agreement is reduced to writing.  Millgard, 224 F. Supp. 2d at 432; Hostcentric Tech., Inc. v. Republic Thunderbolt, No. 04CV1621, 2005 WL 1377853, at *4 (June 9, 2005).  However, "if the parties did not intend to enter into a binding agreement without a writing, they will not be legally bound until that condition is met."  Consarc, 996 F.2d at 574.

The Second Circuit has articulated four factors that guide the Court in determining the intent of the parties to be bound by an oral agreement:[4]

> (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

---

[4] The Second Circuit has enumerated as many as 16 factors to consider in determining intent to be bound:
"Although an exhaustive list will not be produced, some of the most common factors relied on in determining intent include:  (1) number of terms agreed upon compared to total number to be included, (2) relationship of the parties, (3) degree of formality attending similar contracts, (4) acts of partial performance by one party accepted by the other, (5) usage and custom of the industry, (6) subsequent conduct and interpretation by the parties themselves, (7) whether writing is contemplated merely as a memorial, (8) whether contract needs a formal writing for its full expression, (9) whether any terms remain to be negotiated, (10) whether contract has few or many details, (11) whether amount involved is large or small, (12) whether a standard form is widely used in similar transactions or whether this is an unusual type of contract. . . . To these might be added (13) the speed with which the transaction must be concluded, (14) the simplicity or complexity of the transaction, (15) the availability of information necessary to decide whether to enter into a contract, and (16) the time when the contract was entered into." Consarc, 996 F.2d at 575-76 (citations omitted).  This Court chooses to review the streamlined list of factors considered by the Second Circuit in Ciaramella and Winston.

Ciaramella, 131 F.3d at 323 (citing Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80-81 (2d Cir. 1985)).  See also R.G. Group, Inc., 751 F.2d at 75-76.  No single factor will be determinative, but each provides significant guidance.  Id. at 75.

As to the first factor in Ciaramella, Defendants argue that requiring Plaintiffs to execute a settlement agreement and general release as a condition of settlement did not constitute an express reservation not to be bound.  However, Paindiris's letter of November 8, 2004 enclosed "proposed settlement agreements," and he asked O'Neil to please "confirm that the terms are acceptable."  Furthermore, Tindall's October 27, 2004 letter evinced an intent not to be bound, stating that the settlement was contingent on both Plaintiffs executing an agreement, and that the settlement discussions would remain confidential "regardless of whether [Plaintiffs] ultimately execute the Settlement Agreements."

As to the second factor, Defendants assert partial performance of the contract because they did not move for summary judgment by the November, 2004 deadline and because they sent drafts of the settlement agreement and release to O'Neil for her review.  Plaintiffs, not having any idea that O'Neil may have accepted a settlement offer, did not engage in any partial performance of the alleged contract.

As to the third factor, it is not clear from Tindall's October 27, 2004 letter whether the unresolved terms included the confidentiality paragraph, the liquidated damages, and the non-disparagement provision as well as the specific allocation of the settlement monies among wages, attorney's fees and damages for emotional distress.[5] And, as noted above, Paindiris's letter noted that he was enclosing "proposed" agreements and wanted O'Neil to confirm the terms. There is no clear evidence that all of the terms of the alleged contract had been agreed upon.

And finally, settlements are usually required to be in writing, or made on the record in open court. Ciaramella, 131 F.3d at 326 (citation omitted). Accord Winston, 777 F.2d at 83.[6]

The purported settlement here was somewhat unusual. The alleged settlement discussions were conducted in private, over the telephone, rather than in front of a judicial officer, and neither party notified the Court that settlement had been reached. It could not be more clear to this Court that the settlement was premature and against the wishes of the

---

[5] Tindall's letter reads in part: "As we discussed, Plaintiffs will sign a Settlement Agreement and General Release, which will release Defendants of and from any and all claims, including but not limited to those raised in Plaintiffs' pending action. In addition, the Settlement Agreement will include . . . ." Tindall Aff. The sentence beginning "In addition..." can be construed to mean either: 1) In addition to what we discussed . . . or 2) In addition, we discussed . . . .

[6] "Where, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation." Winston, 777 F.2d at 83.

17

Plaintiffs, as they 1) did not know their attorney was engaging in settlement discussions; 2) did not know settlement had been reached on October 18, 2004 until some time in late October; and 3) rejected the settlement offer the same day they learned about it. Thus, enforcing such a premature settlement would do little to further a policy of encouraging settlements. Ciaramella, 131 F.3d at 323. Defendants seemingly were misled by O'Neil, but that is not reason enough to enforce a purported settlement when none should have existed.

Construing the facts in the light most favorable to the non-movants, this Court finds that the oral settlement, whatever it was, was premature, and Plaintiffs Ruzika and LaCombe are not bound by an oral agreement to which they were not a party and about which they only learned some time after the fact.

C.  Defendants' Request for Costs and Fees

Defendants have also requested an award of attorney's fees and costs related to the filing of their motion to enforce. Such an award is not appropriate here. Attorney's fees may be awarded to the prevailing party if his opponent "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." F.D. Rich Co., Inc. v. United States, Indus. Lumber Co. Inc., 417 U.S. 116, 129 (1974). Defendants have not prevailed here, and have not offered evidence that Plaintiffs' behavior rises to this level.

18

Conclusion

O'Neil allegedly represented to Defendants' counsel that her clients had had a "change of heart" regarding the purported settlement. If indeed this Court believed that were true, it would be appropriate to enforce the settlement. However, Plaintiffs have put forth affirmative evidence that O'Neil never informed them she was engaging in settlement negotiations, and accepted an offer to settle before discussing it with her clients, who, when told of the offer, promptly rejected it. "Clients should not be faced with a Hobson's choice of denying their counsel all authority to explore settlement or being bound by *any* settlement to which their counsel might agree, having resort only to an action against their counsel for malpractice." Fennell, 865 F.2d at 503 (emphasis in original). Accordingly, Defendants' Motion for Enforcement of Settlement Agreement [Doc. No. 58] is DENIED.[7]

SO ORDERED.

_____
ELLEN BREE BURNS, SENIOR JUDGE
UNITED STATES DISTRICT COURT

Dated at New Haven, CT, this \_\_\_\_ day of August, 2005.

---

[7] If the parties wish to pursue settlement discussions, they may request a referral to Magistrate Judge Margolis.